## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

GENERAL ELECTRIC BUSINESS )
FINANCIAL SERVICES, INC., f/k/a )
MERRILL LYNCH BUSINESS )
FINANCIAL SERVICES, INC. )
           )
        Plaintiff, )    Case No. 09 C 364
           )
v. )    Judge Robert W. Gettleman
           )
DONALD L. SILVERMAN, ERIC W. )
BRAUSS, and TODAY REALITY )
ADVISORS, INC. )
           )
        Defendants. )

### ANSWER TO AMENDED COMPLAINT AND AFFIRMATIVE DEFENSES

Defendants, Donald L. Silverman, Eric W. Brauss, and Today Realty Advisors, Inc., by

and through their attorneys, answer Plaintiff General Electric Business Financial Services, Inc.'s

Amended Complaint as follows:

### PARTIES, JURISDICTION, AND VENUE

.1.     GE Business Financial Services is a New York corporation with its principal
place of business in Chicago, Illinois, which was formerly known under the name of Merrill
Lynch Business Financial Services, Inc. GE Business Financial Services is thus a citizen of New
York and Illinois. *See* 28 U.S.C. § 1332(c)(1).

**ANSWER**:   On information and belief, Defendants admit the allegations in paragraph 1.

2.     Defendant Donald L. Silverman ("Silverman") is an individual and a citizen of
Dallas, Texas.

**ANSWER:**    Admit.

3.     Defendant  Eric W. Braun ("Braun") is an individual and a citizen of Dallas,
Texas.

**ANSWER:**    Admit.

4.     Defendant Today Realty Advisors, Inc. ("TRA") is a Texas corporation with its principal place of business in Dallas, Texas.  TRA is thus a citizen of Texas.  *See* 28 U.S.C. § 1332(c)(1).

**ANSWER:**   Admit.


5.     This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332(a) because this is an action for damages in excess of $75,000, exclusive of interest and costs, and there is complete diversity between the parties.

**ANSWER:**   This allegation states a legal conclusion to which no answer is required.


6.     Pursuant to 28 U.S.C. § 1391(a)(2), venue is proper in the Northern District of Illinois because the complained-of conduct in part occurred within the district.  In addition, GE Business Financial Services and Defendants agreed to the non-exclusive jurisdiction of the state and federal courts having jurisdiction in the City of Chicago, County of Cook, and the State of Illinois for any action arising out of the Guaranty and Limited Joinder at issue in this case.

**ANSWER:**   This allegation states a legal conclusion to which no answer is required.


## FACTUAL ALLEGATIONS

### A.     The Secured and Guaranteed Indebtedness

7.     On or about May 25, 2007, Margaux Warren Park Partners, Ltd. ("Warren Park") entered into a loan agreement ("Loan Agreement") with GE Business Financial Services, whereby GE Business Financial Services agreed to make a first mortgage loan (the "Loan") to Warren Park in an original principal amount of $34,800,000.00 for the acquisition of 91.65 acres of land in Frisco, Collin County, Texas (the "Property").  A copy of the Loan Agreement is attached as Exhibit A.

**ANSWER:**   Defendants refer to the Loan Agreement for its full and complete contents

and deny any allegation contrary thereto.  Defendants deny any remaining allegations.

8.     In connection with the Loan, Warren Park executed a Tranche A Promissory Note, dated May 25, 2007, in the original principal amount of $26,700,000.00, as amended or modified, and a Tranche B Promissory Note, dated May 25, 2007, in the original principal amount of $8,100,000.00, as amended or modified (together, the "Note").  Copies of the Tranche A Promissory Note and the Tranche B Promissory Note are attached as Exhibits B and C, respectively.

**ANSWER:**   Defendants refer to the Tranche A Promissory Note and the Tranche B Promissory Note for their full and complete contents and deny any allegation contrary thereto. Defendants deny any remaining allegations.

9.    In order to induce GE Business Financial Services to make the Loan, contemporaneously with the execution of the Loan Agreement and Note, Defendants Silverman and Brauss each executed a Limited Joinder. A copy of the Limited Joinder is attached to and incorporated by reference into the Loan Agreement (Exhibit A). Pursuant to the terms of the Limited Joinder, Silverman and Brauss each guaranteed the full and complete repayment of the Loan, all Expenses of GE Business Financial Services (as defined in the Loan Agreement), and all other obligations of Warren Park under the Loan Agreement and related documents in the event that Warren Park filed for relief under any federal or state bankruptcy, insolvency or receivership laws.

**ANSWER:**   Defendants refer to the Limited Joinder for its full and complete contents and deny any allegation contrary thereto. Defendants deny any remaining allegations.

10.    Contemporaneously with the execution of the Note, Defendants each executed an absolute, continuing, unconditional, and irrevocably guaranty (the "Guaranty"). A copy of the Guaranty is attached as Exhibit D. Pursuant to the terms of the Guaranty, Defendants each guaranteed the full and prompt payment of the principal of and interest on the Note, and the full and prompt payment of all sums that may become due under the Note, the Loan Agreement and the other Loan documents, subject to a maximum liability of $17,400,000 plus 100% of accrued interest and fees. In addition, Defendants also each guaranteed the full and prompt payment of any Enforcement Costs, as defined in Section 7 of the Guaranty, including, but not limited to, all attorneys' fees, costs, and expenses incurred in connection with the enforcement of the Guaranty and other Loan documents.

**ANSWER:**   Defendants refer to the Guaranty for its full and complete contents and deny any allegation contrary thereto. Defendants deny any remaining allegations.

11.    GE Business Financial Services is the owner and holder of, and is in possession of, the Loan Agreement, the Note, and the Guaranty.

**ANSWER:**   On information and belief, Defendants admit the allegations in paragraph 11.

**B.    Warren Park's Default**

12.    Warren Park defaulted under the Loan Agreement by failing to pay the amount of $2,500,000.00 to GE Business Financial Services pursuant to Section 2.10(c) of the Loan Agreement. Notice of this default was provided to Warren Park and Defendants on June 5, 2008.

As a result of Warren Park's failure to pay amounts owed under the Loan Agreement, an Event of Default (as defined in the Loan Agreement) occurred and is continuing.

**ANSWER:**   Defendants admit that GE claims Warren Park defaulted under the Loan Agreement, that proper notice was provided, and that an Event of Default occurred and is occurring, Defendants deny the remaining allegations.

13.   As a result of this Event of Default, GE Business Financial Services accelerated the maturity date of the Note and declared all sums due under the Warren Park Loan documents, including, but not limited to, principal, interest and default interest (which continue to accrue), and late fees due and payable.  Notice of acceleration and demand for payment was made to Warren Park and Defendants on September 3, 2008, yet to date no payment has been made.

**ANSWER:**   Defendants admit that GE claims that Warren Park has defaulted under the Note, that notice of acceleration and demand for payment were issued, and that no payment has been made.  Defendants deny that any amounts are due and owing, and deny the remaining allegations.

14.   On December 16, 2008, Warren Park filed for Chapter 11 bankruptcy in the United States Bankruptcy Court, Eastern District of Texas, Sherman Division.

**ANSWER:**   Admit.

### COUNT I – BREACH OF LIMITED JOINDER
### (AGAINST DEFENDANTS SILVERMAN AND BRAUSS)

15.   GE Business Financial Services repeats and realleges the allegations set forth in Paragraphs 1 through 14 as though fully set fort in this Count.

**ANSWER:**   Defendants repeat and reallege their answers to the allegations set forth in paragraphs 1-14.

16.   The Limited Joinder is a valid and enforceable written contract.

**ANSWER:**   Paragraph 16 states a legal conclusion to which no answer is required. Defendants deny any remaining allegations in this paragraph.

17.   Warren Park filed for Chapter 11 bankruptcy on December 16, 2008.  As a result, Silverman and Brauss became personally liable for the full and complete repayment of the Loan, all Expenses of GE Business Financial Services (as defined in the Loan Agreement), and all

4

other obligations of Warren Park under the Loan Agreement and related documents pursuant to the terms of the Limited Joinder.

**ANSWER:**   Defendants admit the allegations in the first sentence of paragraph 17.

Defendants deny the remaining allegations.

18.   Silverman and Brauss have failed to satisfy their obligations under the Limited Joinder.

**ANSWER:**   Deny.

19.   All conditions precedent to GE Business Financial Services' recovery for the claim asserted herein have occurred or have been performed.

**ANSWER:**   Paragraph 19 states a legal conclusion to which no answer is required.

Defendants deny any remaining allegations in this paragraph.

## COUNT II – BREACH OF GUARANTY
## (AGAINST ALL DEFENDANTS)

20.   GE Business Financial Services repeats and realleges the allegations set forth in Paragraphs 1 through 14 as though fully set forth in this Count.

**ANSWER:**   Defendants repeat and reallege their answers to the allegations set forth in

paragraphs 1-14.

21.   The Note and the Guaranty are valid and enforceable written contracts.

**ANSWER:**   Paragraph 21 states a legal conclusion to which no answer is required.

Defendants deny any remaining allegations in this paragraph.

22.   GE Business Financial Services is the owner and holder of, and is in possession of, the original Note and the Guaranty.

**ANSWER:**   Defendants lack information sufficient to form a belief as to the truth or

falsity of this allegation.

23.   Warren Park has defaulted under the Note by, among other things, failing to make payments when due.  As a result of such default, GE Business Financial Services accelerated the maturity date of the Note and declared all sums due under the Warren Park Loan Documents, including, but not limited to, principal, interest and default interest (which continue to accrue), and late fees due and payable.  To date, no payment has been made.

**ANSWER:**   Defendants admit that GE claims that Warren Park has defaulted under the Note, and that no payment has been made.  Defendants deny that any amounts are due and owing, and deny the remaining allegations.

24.   Pursuant to the Guaranty, GE Business Financial Services is entitled to recover from Silverman, Brauss and TRA, jointly and severally, amounts due and owing under the Note that have not been paid not to exceed the amount of $17,400,000.00, in addition to interest, fees, Enforcement Costs, and other expenses.

**ANSWER:**   Defendants refer to the Guaranty for its full and complete contents and deny any allegation contrary thereto.  Defendants deny the remaining allegations.

25.   All conditions precedent to GE Business Financial Services' recovery for the claim asserted herein have occurred or have been performed.

**ANSWER:**   Paragraph 25 states a legal conclusion to which no answer is required. Defendants deny any remaining allegations in this paragraph.

## AFFIRMATIVE DEFENSES

Defendants assert the following facts common to their affirmative defenses:

1.   Silverman is a principal of Margaux Development Company ("MDC"), a Dallas-based real estate development company that typically develops commercial, multi-family residential and mixed used real estate projects.

2.   MDC and TRA teamed up to do a mixed use real estate development in Frisco, Collin County, Texas, which is located at the corner of Warren Parkway and the Dallas North Tollway (the "Property").

3.   The Property was owned by HCA, who planned to build a hospital facility on the Property.  In March, 2007, Silverman learned that HCA no longer planned to build its hospital on the Property, and Silverman, through an entity he controlled -- Jade Acquisitions, Inc., (hereinafter, "Buyer") a Texas corporation -- made an offer to buy 91.645 acres.  A purchase

contract for the 91 acres was executed.  The sale price for the Property was $30,375,000, and $250,000 was escrowed by the Buyer.

4.      For the next two months, MDC and TRA began working to secure financing and investors for the Property and development thereof and otherwise prepare for the closing on the Property.  Margaux Warren Park Partners, Ltd. ("Warren Park") was established to own the Property, and Warren 91, LLC was established to serve as the general partner of Warren Park. Today Tollway Land, L.P., an affiliate of Brauss, and Margaux Partners 2007, Ltd., an affiliate of Silverman, are the limited partners of Warren Park.

5.      MDC and TRA had both used Metropolitan Capital Advisors, Ltd. ("MetCap"), a real estate investment banking firm, in the past, and they decided to again use MetCap to assist them with securing a lender for this transaction. Plaintiffs and MetCap began talking with Merrill Lynch about financing this transaction, a deal Merrill Lynch aggressively pursued.  MDC, TRA and MetCap have all done business with the individuals at Merrill Lynch, including William Ballant and John Petrovsky, who worked on this loan.  Based on Defendants' prior experience with these individuals at Merrill Lynch the representations they and others at Merrill Lynch made, Defendants decided to move forward with Merrill Lynch as the lender on this deal.

6.      In the weeks prior to the closing of the loan, Merrill Lynch, through its employee William Ballent, told Defendants that so long as they were working diligently on the Warren Park project and making reasonably prompt progress on the project, Merrill Lynch would make necessary modifications, extensions and accommodations as needed in order for completion of the project.   Based on prior conduct amongst the parties, Defendants accepted these representations as true.  Specifically, in prior instances involving the same parties, when the borrower needed additional time to complete an aspect of the project or ran into a delay over

which it did not have control, Merrill Lynch had, in the past, always done exactly what it said it would do in this case – worked with the borrower to modify and/or extend its loan agreements in order to give the borrower additional time and/or funding needed to complete the project.

7.      Based on the representations, on May 22, 2007, Jade Acquisitions, Inc. assigned the purchase contract for the Property to Warren Park.  On May 25, 2007, the closing on the purchase contract for the Property occurred (the "Closing").  The loan with Merrill Lynch was structured as a typical land development loan, as others in the past had been, that provided for initial funding of a portion of the loan used to purchase the land and pay various fees, for monthly draws and for interest reserves.  In association with the Closing, Warren Park entered into the following written agreements with Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch"):

    a.      a Loan Agreement for a loan in the amount of $34,800,000 (the "Loan");

    b.      a Deed of Trust, Security Agreement, Assignment of leases and Rents, and Fixtures Filing agreement for the benefit of Merrill Lynch to secure the Loan (the "Deed of Trust");

    c.      two Promissory Notes in favor of Merrill Lynch, one in the amount of $26,700,000 and one in the amount of $8,100,000 (the "Promissory Notes"); and,

    d.      various UCC financing statements.

8.      Silverman, Brauss and TRA also executed guarantees in favor of Merrill Lynch for the amount of the debt.

9.      The loan package for this transaction included a number of standard fees, including equity placement fees for TRA, acquisition fees for Silverman and Brauss, a broker's

fee for MetCap and approximately $400,000 in lender fees for Merrill Lynch. Merrill Lynch had issued a loan commitment and application with the terms of the Loan approximately 40 days prior to Closing. At all material times, Merrill Lynch knew the above-described fees that would be paid from the loan proceeds and told the Plaintiffs as much. Mere hours prior to Closing, John Petrovsky and William Ballent, on behalf of Merrill Lynch, told Warren Park that the above-described fees were too high for Merrill Lynch's loan committee to approve unless it substantially changed the terms of the Loan package to require Warren Park, by the first anniversary date of the Loan, to either: (a) make a $2,500,000 payment on the Loan; or, (b) have sold at least 10 acres of the land at $10.80 per square foot and have certain entitlements from the City of Frisco.

10. Because Merrill Lynch waited until just prior to the Closing to change the conditions of the Loan, Defendants, who had signed a purchase contract for the Property on which the due diligence option period had already lapsed and who had invested a substantial amount of money preparing to close on the deal, had no choice but to accept Merrill Lynch's predatory, extortive changes to the Loan. In fact, had these onerous deal terms not been accepted, there would have been a default under the purchase contract, and the parties would have been deprived of purchasing the Property, and lost over $800,000 in fees and expenses incurred in anticipation of closing. Merrill Lynch, acting through its agents, William Ballent and John Petrovsky, essentially did a "bait and switch" in connection with the terms of this Loan.

11. Until this time, Defendants' relationship with Merrill Lynch was one of trust. While not happy about Merrill Lynch's "bait and switch" move, Defendants were not greatly concerned at the time about how it would impact the Warren Park project because Merrill Lynch, through Ballent, represented to Defendants that, if need be in the future, Merrill Lynch would

modify and/or extend the Loan to meet any reasonable business needs as they had always done in the past, and Defendants believed them and relied on these promises when they proceeded with the Warren Park transaction. In fact, after the Loan closed, Ballent and others at Merrill Lynch reiterated these and similar representations.

12.     Relying on such representations, after Closing, Defendants immediately began working on putting together a package for the City of Frisco in order to secure the entitlements newly required by the Loan. In fact, a comprehensive package was prepared and submitted to the City within 90 days of Closing.

13.     While Defendants were working on the development of this Project, the economy in the United States took a downturn, in part because years of abusive lending practices finally caught up with a number of lenders, and the sub-prime lending market collapsed. Unbeknownst to Defendants when they entered into this Loan, Merrill Lynch was heavily involved in predatory lending. Merrill Lynch was heavily invested in sub-prime loans at the time, and there was essentially a melt-down at Merrill Lynch, which culminated in Merrill Lynch being sold to Bank of America in a "fire sale" designed to avoid the bankruptcy filing that other large predatory lenders, like Lehman Brothers, made in September 2008. Prior to its sale to Bank of America, in order to offset its losses, Merrill Lynch began selling its more profitable loans to raise capital. The sale of these loans was usually at a significant discount. The Warren Park Loan was therefore sold as part of a business transaction, and GE became the new "Lender." In addition, the individual bankers that Defendants and MetCap had worked with at Merrill Lynch either left or were terminated.

14.     After GE bought the Loan, GE and the individuals at GE, including Matthew Ehret, Julia Silverstein, Cynthia Loranzo and Carl Jacobson (collectively, the "GE Bankers")

ratified and adopted what Merrill Lynch had started – GE, led by the GE Bankers, embarked on their plan to ultimately take ownership of the Property without compensation beyond the loan proceeds paid to date. In fact, unbeknownst to Defendants, GE bought loans such as the Warren Park Loan through a stock purchase of Merrill Lynch at a significant discount with the plan of ultimately owning the security for the loans. Then, after GE owned the loans, GE and the GE Bankers began making it as difficult as possible for borrowers to fulfill their loan obligations and stay out of default. As soon as a borrower became in default, in direct contradiction to what Merrill Lynch and the individuals at Merrill Lynch told Defendants prior to and after they entered into the loan agreements related to Warren Park, GE immediately sent out default notices and began taking steps to foreclose on the security for the loans. GE's "loan-to-own" predatory practices were no different for Warren Park.

15.    By May of 2008, when Warren Park was due to either: (a) make a $2,500,000 payment on the Loan; or, (b) have sold at least 10 acres of the land at $10.80 per square foot and have certain entitlements from the City of Frisco, Warren Park still did not have all of the required approvals from the City. Warren Park did have a commitment letter from one buyer to purchase 20 acres for at least $10.80 per square foot – an amount of approximately $10,000,000, which would bring approximately four times the required buy-down amount needed under the terms of the Loan. Warren Park had also obtained certain zoning for the Property; however, it still lacked certain approvals from the City to meet the oppressive Loan requirements. Though Warren Park had submitted all of the required paperwork to the City of Frisco by August of 2007 and done everything in its power to secure the City of Frisco entitlements and though the City of Frisco repeatedly said it liked Defendants' proposed development, the City, through no fault of Warren Park's, had just not issued its final approvals by May of 2008.

16.    Warren Park therefore went to GE (with a buyer in hand), explained the situation with the City and asked for an extension. GE refused to even discuss the matter with Warren Park unless and until they signed a negotiating agreement. Warren Park signed the agreement on June 12, 2008 and returned it to GE. Warren Park also made a written proposal to GE on June 19, 2008.

17.    When GE, through the GE Bankers, finally agreed to discuss Warren Park's requested extension, GE would only agree to give Warren Park a forbearance on the Loan -- GE would not agree to an extension or a modification (i.e., accept the pending sale of 20 acres with the entitlements that Defendants did have) as Merrill Lynch and the individuals at Merrill Lynch had promised Defendants they would do if Defendants found themselves in the very situation in which they did find themselves -- waiting on the City of Frisco to issue documents. In exchange for the forbearance, GE agreed not to foreclose on its security interest until July 25, 2008. GE charged Warren Park $250,000 for this forbearance. At the time, Warren Park paid the $250,000 because GE, through the GE Bankers, promised Defendants that GE would modify the Loan before the July 25, 2008 deadline. In addition, Warren Park paid the $250,000 fee because GE, through William Ballent and John Petrovsky, told Defendants that the loan committee would approve its proposal and because they were told that $200,000 of the $250,000 "fee" would be applied to the Loan balance.

18.    By mid-July, 2008, despite Warren Park's best efforts, it still did not have the City's approvals required by the Loan. Warren Park did, however, have a second offer to buy 10 acres at the $10.80 per square foot price, which is a value of approximately $5,000,000. Warren Park therefore went back to GE the week of July 14, 2008 with a request to extend the time period by when it would have to have the City's approval and to offer to pay the sales proceeds

from the 10 acre land sale to GE in order to pay down the Loan. After all, selling the land and repaying the Loan is the end game, and Warren Park's offer was to do just that. When Warren Park approached Matthew Ehret of GE in July of 2008, GE initially said that Warren Park's proposal sounded good but that it would just need the loan committee's stamp of approval.

19.     By July 18, 2008, without explanation, GE notified Warren Park that it would not extend or alter the Loan and that if Warren Park did not (a) pay an additional $2,500,000 by July 25, 2008; (b) agree to move up the maturity date from May 2009 to January 2009; and, (c) agree that no further draws on the Loan would be allowed, GE would begin foreclosure proceedings immediately. Warren Park again tried to meet with GE, who, through Matthew Ehret and Julia Silverstein, refused to even meet with Warren Park.

20.     In today's lending market, Warren Park would have never have been able to re-finance the Loan between July 18, 2009 and January of 2009. Likewise, the development would not have been in a position to be fully sold by that time either. GE knew this. GE's plan, clearly, was for Warren Park to pay $2,500,000, make no further draws on the Loan and agree to move up the maturity date so that Warren Park would never be able to meet it, which will ultimately give GE the chance to foreclose in January 2009, $2,500,000 richer! GE would, therefore, get more of Warren Park's money plus get the Property, which is currently worth approximately $39,600,000, for only the small amount it paid to acquire the stock of Merrill Lynch and any Loan disbursements GE has made in the last few months, netting a profit to GE of approximately $20,000,000.     In fact, as GE would later admit to Defendants, through Matthew Ehret, Julia Silverstein and others, GE no longer wanted to be in the real estate lending business and planned to do everything it could to get rid of loans like the one at issue in this case as quickly as possible and get as much money as possible in the process. Obviously, GE's loan

is more than fully secured by the Property, even if 10 acres of it is sold and the proceeds from the sale of the 10 acres are used to pay down the Loan.

21.     Warren Park could not agree to the onerous, debilitating terms most recently proposed by GE and the GE Bankers.   In addition to the $34,800,000 in loan proceeds, Warren Park raised approximately $8,000,000 in equity from investors.   Warren Park has a substantial amount of money invested in this project.   Warren Park, therefore, not only stands to lose the equity it has accumulated in the Property, but also the funds invested thus far in the project and its investor's funds.  GE is well aware of these facts.

### First Affirmative Defense (Fraud in the Inducement)

22.     Through its conduct, GE fraudulently induced the Borrower to enter into the Note and the Defendants to enter into the Guaranty and Limited Joinder, thereby invalidating the obligations set forth in those documents.

### Second Affirmative Defense (Duress)

23.     The Borrower executed the Note under duress and the Defendants executed the Guaranty and Limited Joinder under duress.

### Third Affirmative Defense (Equitable Estoppel)

24.     As a result of its conduct, GE should be equitably estopped from enforcing the obligations contained in the Note, Guaranty and Limited Joinder.

### Fourth Affirmative Defense (Unclean Hands)

25.     As a result of its conduct, GE has unclean hands and is thereby precluded from enforcing the terms of the Note, Guaranty, and Limited Joinder.

Respectfully submitted,


By:     /s/ Shawn M. Staples
        One of Their Attorneys


Steven P. Blonder
Shawn M. Staples
MUCH SHELIST DENENBERG
  AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois  60606
Telephone:  312-521-2000

## CERTIFICATE OF SERVICE

I, Shawn M. Staples, an attorney, certify that on August 19, 2009, I electronically filed

**Answer to Amended Complaint and Affirmative Defenses**, with the Clerk of Court using the

CM/ECF system, which will send notification of such filings to the following:

> Timothy J. Patenode
> Dawn M. Canty
> Heather Kuhn O'Toole
> KATTEN MUCHIN ROSENMAN LLP
> 525 West Monroe
> Chicago, Il 60661

<u>/s/</u>  Shawn M. Staples