IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GENERAL ELECTRIC BUSINESS FINANCIAL SERVICES, INC., f/k/a MERRILL LYNCH BUSINESS FINANCIAL SERVICES, INC. <br><br>           Plaintiff, <br><br> v. <br><br> DONALD L. SILVERMAN, ERIC W. BRAUSS, and TODAY REALTY ADVISORS, INC. <br><br>           Defendants. | Case No. 09 C 364 <br><br> Judge Robert W. Gettleman Magistrate <br><br> Judge Nan R. Nolan |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
LOCAL RULE 56.1(A) STATEMENT OF MATERIAL FACTS**

Defendants Donald L. Silverman, Eric W. Brauss, and Today Realty Advisors, Inc., by their attorneys, respond to Plaintiff's Local Rule 56.1(A) Statement of Material Factas as follows:

**I.     PARTIES, JURISDICTION, AND VENUE**

1.     GE Business Financial Services is a New York corporation with its principal place of business in Chicago, Illinois, which was formerly known under the name of Merrill Lynch Business Financial Services, Inc. (Affidavit of Matthew Ehret ("Ehret Aff "), ¶ 2; Docket No. 29, Answer to Amended Complaint and Affirmative Defenses ("Answer"), ¶1.)

ANSWER:

Admit.

2.     Defendant Donald L. Silverman ("Silverman") is an individual and a citizen of Dallas, Texas. (Answer ¶2.)

ANSWER:

Admit.

    3.    Defendant Eric W. Brauss ("Brauss") is an individual and a citizen of Dallas, Texas. (Answer ¶3.)

ANSWER:

Admit.

    4.    Defendant Today Realty Advisors, Inc. ("TRA") is a Texas corporation with its principal place of business in Dallas, Texas. TRA is thus a citizen of Texas. (Answer ¶4.)

ANSWER:

Admit.

    5.    This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332(a) because this is an action for damages in excess of $75,000, exclusive of interest and costs, and there is complete diversity between the parties. (Docket No. 9, Am. Compl. ¶5.)

ANSWER:

Admit.

    6.    Pursuant to 28 U.S.C. §1391(a)(2), venue is proper in the Northern District of Illinois because the complained-of conduct in part occurred within the district. (Am. Compl. ¶6.)

ANSWER:

Admit.

    7.    In addition, GE Business Financial Services and Defendants agreed to the

non-exclusive jurisdiction of the state and federal courts having jurisdiction in the City of Chicago, County of Cook, and the State of Illinois for any action arising out of the Guaranty and Limited Joinder at issue in this case. (Limited Joinder, attached as part of Ehret Aff., Ex. A, ¶3; Guaranty, attached as Ehret Aff. Ex. D, ¶17.)

ANSWER:

Admit.

## II. FACTUAL ALLEGATIONS
### A. The Secured and Guaranteed Indebtedness

8. On or about May 25, 2007, Margaux Warren Park Partners, Ltd. ("Warren Park") entered into a loan agreement ("Loan Agreement") with GE Business Financial Services, whereby GE Business Financial Services agreed to make a first mortgage loan (the "Loan") to Warren Park in an original principal amount of $34,800,000 for the acquisition of 91.65 acres of land in Frisco, Collin County, Texas (the "Property"). (Ehret Aff. ¶3; *id.* Ex. A.)

ANSWER:

Admit.

9. In connection with the Loan, Warren Park executed a Tranche A Promissory Note, dated May 25, 2007, in the original principal amount of $26,700,000.00, as amended or modified, and a Tranche B Promissory Note, dated May 25, 2007, in the original principal amount of. $8,100,000.00, as amended or modified (together, the "Note"). (Ehret Aff. ¶5; *id.* Exs. B, C.)

ANSWER:

Admit.

10. In order to induce GE Business Financial Services to make the Loan,

contemporaneously with the execution of the Loan Agreement and Note, Defendants Silverman and Brauss each executed a Limited Joinder. (Ehret Aff. ¶4; *id.* Ex. A.)

ANSWER:

Denied. Merrill Lynch required Defendants to enter into the guaranties in order to issue the loan and commence the project. (*See*, Silverman Affidavit¶ 8.) Moreover, Merrill Lynch induced Defendants to enter into the loan documents based on misrepresentations as to the loan terms and Merrill Lynch's willingness to modify those terms, and engaged in a bait and switch with respect to the loan terms. (*See*, Silverman Affidavit¶¶'s 5-6, 9-10.)

   11. Pursuant to the terms of the Limited Joinder, Silverman and Brauss each guaranteed the full and complete repayment of the Loan, all Expenses of GE Business Financial Services (as defined in the Loan Agreement), and all other obligations of Warren Park under the Loan Agreement and related documents in the event that Warren Park filed for relief under any federal or state bankruptcy, insolvency or receivership laws. (Ehret Aff. Ex. A (Limited Joinder), ¶1(b).)

ANSWER:

Defendants admit that they entered into the Limited Joinder, which contained the above described terms but further state that Merrill Lynch required Defendants to enter into the guaranties in order to issue the loan and commence the project. (*See*, Silverman Affidavit¶ 8.) Moreover, Merrill Lynch induced Defendants to enter into the loan documents based on misrepresentations as to the loan terms and Merrill Lynch's willingness to modify those terms, and engaged in a bait and switch with respect to the loan terms. (*See*, Silverman Affidavit ¶¶'s 5-6, 9-10.)

12.     Contemporaneously with the execution of the Note, Defendants each executed an absolute, continuing, unconditional, and irrevocable guaranty (the "Guaranty"). (Ehret Aff. ¶6; *id.* Ex. D.)

ANSWER:

Defendants admit that they entered into the Guaranty but further state that Merrill Lynch required Defendants to enter into the guaranties in order to issue the loan and commence the project.  (*See*, Silverman Affidavit¶ 8.)   Moreover, Merrill Lynch induced Defendants to enter into the loan documents based on misrepresentations as to the loan terms and Merrill Lynch's willingness to modify those terms, and engaged in a bait and switch with respect to the loan terms.  (*See*, Silverman Affidavit¶¶'s 5-6, 9-10.)

13.     Pursuant to the terms of the Guaranty, Defendants each guaranteed the full and prompt payment of the principal of and interest on the Note, and the full and prompt payment of all sums that may become due under the Note, the Loan Agreement and the other Loan documents, subject to a maximum liability of $17,400,000 plus 100% of accrued interest and fees. (Ehret Aff. Ex. D ¶¶1, 20.)

ANSWER:

Defendants admit that they entered into the Guaranty, which contained the above described terms but further state that Merrill Lynch required Defendants to enter into the guaranties in order to issue the loan and commence the project.  (*See*, Silverman Affidavit¶ 8.)   Moreover, Merrill Lynch induced Defendants to enter into the loan documents based on misrepresentations as to the loan terms and Merrill Lynch's willingness to modify those terms, and engaged in a bait and switch with respect to the

loan terms. (*See*, Silverman Affidavit¶¶'s 5-6, 9-10.)

14. In addition, Defendants also each guaranteed the full and prompt payment of any Enforcement Costs, as defined in Section 7 of the Guaranty, including, but not limited to, all attorneys' fees, costs, and expenses incurred in connection with the enforcement of the Guaranty and other Loan documents. (Ehret Aff. Ex. D ¶7.)

ANSWER:

Defendants admit that they entered into the Guaranty, which contained the above described terms but further state that Merrill Lynch required Defendants to enter into the guaranties in order to issue the loan and commence the project. (*See*, Silverman Affidavit¶ 8.) Moreover, Merrill Lynch induced Defendants to enter into the loan documents based on misrepresentations as to the loan terms and Merrill Lynch's willingness to modify those terms, and engaged in a bait and switch with respect to the loan terms. (*See*, Silverman Affidavit¶¶'s 5-6, 9-10.)

15. GE Business Financial Services is the owner and holder of, and is in possession of, the Loan Agreement, the Note, and the Guaranty. (Ehret Aff ¶7.)

ANSWER:

Admit.

    **B.**    **Warren Park's Default**

16. Warren Park defaulted under the Loan Agreement by failing to either: pay the amount of $2,500,000.00 to GE Business Financial Services pursuant to Section 2.10(c) of the Loan Agreement, or to sell no less than ten acres of the Property (defined in the Loan Agreement). (Ehret Aff. ¶8; Aff. Defenses ¶15.)

ANSWER:

Defendants admit that Warren Park was unable to pay the amount of $2.5 million to G.E. Business Financial Services or to sell no less than ten acres of the Property. However, Defendants further state that those terms were added to the loan agreement pursuant to a bait and switch. (*See*, Silverman Affidavit¶¶'s 9-10.)

17.     Notice of this default was provided to Warren Park and Defendants on June 5, 2008. (Ehret Aff. ¶ 9; *id.* Ex. E.) As a result of Warren Park's failure to pay amounts owed under the Loan Agreement, an Event of Default (as defined in the Loan Agreement) occurred and is continuing. (Ehret Aff. ¶10.)

ANSWER:

Defendant admit that notice of the claimed default was provided to Warren Park and Defendants on June 5, 2008. (Ehret Aff. ¶ 9; *id.* Ex. E.) Defendants also admit that Plaintiff claim an Event of Default (as defined in the Loan Agreement) occurred and is continuing. (Ehret Aff. ¶10.)

18.     As a result of this Event of Default, GE Business Financial Services accelerated the maturity date of the Note and declared all sums due under the Warren Park Loan documents, including, but not limited to, principal, interest and default interest (which continue to accrue), and late fees due and payable. (Ehret Aff. ¶10; Answer ¶13.)

ANSWER: Defendants admit that GE Business Financial Services claimed an acceleration of the maturity date of the Note and declared that it was entitled to all sums due under the Warren Park Loan documents, including, but not limited to, principal, interest and default interest (which continue to accrue), and late fees due and payable. (Ehret Aff. ¶10; Answer ¶13.)

19.     Notice of acceleration and demand for payment was made to Warren Park

and Defendants on September 3, 2008, yet to date no payment has been made. (Answer ¶13.)

ANSWER:

Admit.

20.     On December 16, 2008, Warren Park filed for Chapter 11 bankruptcy in the United States Bankruptcy Court, Eastern District of Texas, Sherman Division. (Answer ¶14.)

ANSWER:

Admit.

## ADDITIONAL FACTS

21.     Donald Silverman ("Silverman") is a principal of Margaux Development Company ("MDC"), a Dallas-based real estate development company that typically develops commercial, multi-family residential and mixed used real estate projects. (Silverman Aff. ¶ 1.)

22.     MDC and Today Realty Advisors, Inc. ("TRA"), which is an affiliated company of Eric Brauss, teamed up to do a mixed use real estate development in Frisco, Collin County, Texas, which is located at the corner of Warren Parkway and the Dallas North Tollway (the "Property"). (Silverman Aff. ¶ 2.)

23.     The Property was owned by HCA, who planned to build a hospital facility on the Property. (Silverman Aff. ¶ 3.) In March, 2007, Defendants learned that HCA no longer planned to build its hospital on the Property, and Silverman, through an entity Silverman controlled -- Jade Acquisitions, Inc., (hereinafter, "Buyer") a Texas corporation -- made an offer to buy 91.645 acres. (*Id.*) A purchase contract for the 91 acres was executed. (*Id.*) The sale price for the Property was $30,375,000, and $250,000 was escrowed by the Buyer. (*Id.*)

24.     For the next two months, MDC and TRA began working to secure financing and investors for the Property and development thereof and otherwise prepare for the closing on the Property. (Silverman Aff. ¶ 4.) Margaux Warren Park Partners, Ltd. ("Warren Park") was established to own the Property, and Warren 91, LLC was established to serve as the general partner of Warren Park. Today Tollway Land, L.P., an affiliate of Brauss, and Margaux Partners 2007, Ltd., an affiliate of Silverman's, are the limited partners of Warren Park. (*Id.*)

25.     MDC and TRA had both used Metropolitan Capital Advisors, Ltd. ("MetCap"), a real estate investment banking firm, in the past, and they used MetCap to assist them with securing a lender for this transaction. (Silverman Aff. ¶ 5.) MDC, TRA, and MetCap began talking with Merrill Lynch about financing this transaction. (*Id.*) MDC, TRA and MetCap have all done business with the individuals at Merrill Lynch, including William Ballant and John Petrovsky, who worked on this loan. (*Id.*) Based on their prior experience with these individuals at Merrill Lynch and the representations they and others at Merrill Lynch made, Defendants decided to move forward with Merrill Lynch as the lender on this deal. (*Id.*)

26.     In the weeks prior to the closing of the loan, Merrill Lynch, through its employee William Ballent, told the representatives at TRA that so long as they were working diligently on the Warren Park project and making reasonably prompt progress on the project, Merrill Lynch would make necessary modifications, extensions and accommodations as needed in order for completion of the project. (Silverman Aff. ¶ 6.) Based on prior conduct amongst the parties, including extensive negotiations on a number of projects brokered by MetCap to other clients where Merrill Lynch and/or the individuals representing Merrill Lynch were the lenders, Defendants accepted these representations as true. (*Id.*) Specifically, it was represented to Silverman that in prior instances when the borrower needed additional time to complete an

aspect of the project or ran into a delay over which it did not have control, Merrill Lynch had, in the past, always done exactly what it said it would do in this case – worked with the borrower to modify and/or extend its loan agreements in order to give the borrower additional time and/or funding needed to complete the project. (*Id.*)

27. On May 22, 2007, Jade Acquisitions, Inc. assigned the purchase contract for the Property to Warren Park. (Silverman Aff. ¶ 7.) On May 25, 2007, the closing on the purchase contract for the Property occurred (the "Closing"). (*Id.*) The loan with Merrill Lynch was structured as a typical land development loan that provided for initial funding of a portion of the loan used to purchase the land and pay various fees, for monthly draws and for interest reserves. (*Id.*) In association with the Closing, Warren Park entered into the following written agreements with Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch"): (1) a Loan Agreement for a loan in the amount of $34,800,000 (the "Loan"); (2) Deed of Trust, Security Agreement, Assignment of leases and Rents, and Fixtures Filing agreement for the benefit of Merrill Lynch to secure the Loan (the "Deed of Trust"); (3) two Promissory Notes in favor of Merrill Lynch, one in the amount of $26,700,000 and one in the amount of $8,100,000 (the "Promissory Notes"); and, (4) various UCC financing statements. (*Id.*)

28. Brauss, TRA, and Silverman also executed guarantees in favor of Merrill Lynch for the amount of the debt. (Silverman Aff. ¶ 8.) Merrill Lynch required Brauss, TRA, and Silverman to sign the guarantees and/or joinders in order to issue the Loan or otherwise commence the project. (*Id.*)

29. Merrill Lynch had issued a loan commitment and application with the terms of the Loan approximately 40 days prior to Closing, which did not include provisions that required a

loan paydown on the first anniversary date. (Silverman Aff. ¶ 9.) Mere hours prior to Closing, John Petrovsky and William Ballent, on behalf of Merrill Lynch, told Warren Park that in order to receive the loan committee's approval, there would need to substantial changes to the terms of the Loan package, requiring Warren Park, by the first anniversary date of the Loan, to either: (a) make a $2,500,000 payment on the Loan; or, (b) have sold at least 10 acres of the land at $10.80 per square foot and have certain entitlements from the City of Frisco. (*Id.*) These terms were not originally included in the loan commitment nor required by the documentation prior to the final documents. (*Id.*) Moreover, Merrill Lynch knew that the due diligence period had expired and signing parties' $250,000 deposit was no longer refundable. (*Id.*) Merrill Lynch claimed that the reason for the last minute change was because the standard fees associated with the loan package were too high. (*Id.*) The loan package for this transaction included a number of standard fees, including equity placement fees for TRA, acquisition fees for Brauss and Silverman, a broker's fee for MetCap and approximately $400,000 in lender fees for Merrill Lynch. (*Id.*) However, at all material times, Merrill Lynch knew the amount of the above-described fees and that they would be paid from the loan proceeds based upon discussions with Merrill Lynch representative stating that the fees were in the budget and approved by Merrill Lynch.. (*Id.*) Therefore, Merrill Lynch had no justifiable reason to change the terms at the last minute. (*Id.*)

30.    Because Merrill Lynch waited until just prior to the Closing to change the conditions of the Loan, the signing parties, who had signed a purchase contract for the Property on which the due diligence option period had already lapsed and who had invested a substantial amount of money preparing to close on the deal, had no choice but to accept Merrill Lynch's predatory, extortive changes to the Loan. (Silverman Aff. ¶ 10.) In fact, had these onerous deal terms not been accepted, there would have been a default under the purchase contract, and the

parties would have been deprived of purchasing the Property, and lost over $800,000 in fees and expenses incurred in anticipation of closing. (*Id.*) Merrill Lynch, acting through its agents, William Ballent and John Petrovsky, essentially did a "bait and switch" in connection with the terms of this Loan. (*Id.*)

31. Until this time, the relationship of Defendants and Merrill Lynch was one of trust. (Silverman Aff. ¶ 11.) While Defendants not happy about Merrill Lynch's "bait and switch" move, there was no other choice but to accept the terms as presented. (*Id.*) Further, although not happy about the terms, Defendants were less concerned at the time about how it would impact the Warren Park project because Merrill Lynch, through Ballent, represented that, if need be in the future, Merrill Lynch would modify and/or extend the Loan to meet any reasonable business needs as they had always done in the past, and Defendants believed them and relied on these promises when they proceeded with the Warren Park transaction. (*Id.*) In fact, after the Loan closed, Ballent and others at Merrill Lynch reiterated these and similar representations to MetCap and Silverman. (*Id.*)

32. Relying on such representations, after Closing, Defendants immediately began working on putting together a package for the City of Frisco in order to secure the entitlements newly required by the Loan. (Silverman Aff. ¶ 12.) In fact, a comprehensive package was prepared and submitted to the City within 90 days of Closing. (*Id.*)

33. While Defendants were working on the development of this Project, Merrill Lynch was sold to GE. (Silverman Aff. ¶ 13.) The Warren Park Loan was therefore sold as part of a business transaction, and GE became the new "Lender." (*Id.*) In addition, the individual bankers that MetCap and I had worked with at Merrill Lynch either left or were terminated. (*Id.*)

34. By May of 2008, when Warren Park was due to either: (a) make a $2,500,000 payment on the Loan; or, (b) have sold at least 10 acres of the land at $10.80 per square foot and have certain entitlements from the City of Frisco, Warren Park still did not have all of the required approvals from the City. (Silverman Aff. ¶ 14.) Warren Park did have a commitment letter from one buyer to purchase 20 acres for at least $10.80 per square foot – an amount of approximately $10,000,000, which would bring approximately four times the required buy-down amount needed under the terms of the Loan. (*Id.*) Warren Park had in place Planned Development zoning for the Property; however, it did not have formal site plan and other approvals from the City required to meet the oppressive Loan requirements. (*Id.*) Though Warren Park had submitted all of the required paperwork to the City of Frisco by August of 2007 and done everything in its power to secure the City of Frisco entitlements and though the City of Frisco repeatedly said it liked the proposed development, the City, through no fault of Warren Park's, had just not issued its final approvals by May of 2008. (*Id.*)

35. Warren Park therefore went to GE (with a buyer in hand), explained the situation with the City and asked for an extension. (Silverman Aff. ¶ 15.) GE refused to even discuss the matter with Warren Park unless and until they signed a negotiating agreement. (*Id.*) Warren Park signed the agreement on June 12, 2008 and returned it to GE. (*Id.*) Warren Park also made a written proposal to GE on June 19, 2008. (*Id.*)

36. When GE, through the GE Bankers, finally agreed to discuss Warren Park's requested extension, GE would only agree to give Warren Park a forbearance on the Loan – GE would not agree to an extension or a modification (i.e., accept the pending sale of 20 acres with the entitlements that Defendants did have) as Merrill Lynch and the individuals at Merrill Lynch had promised they would do if that very situation presented itself – waiting on the City of Frisco

to issue documents. (Silverman Aff. ¶ 16.) In exchange for the forbearance, GE agreed not to foreclose on its security interest until July 25, 2008. (*Id.*) GE charged Warren Park $250,000 for this forbearance. (*Id.*) At the time, Warren Park paid the $250,000 because GE, through the GE Bankers, promised that GE would modify the Loan before the July 25, 2008 deadline. (*Id.*) In addition, Warren Park paid the $250,000 fee because GE represented that the loan committee would approve its proposal and because they were told that $200,000 of the $250,000 "fee" would be applied to the Loan balance. (*Id.*)

37. By mid-July, 2008, despite Warren Park's best efforts, it still did not have the City's approvals required by the Loan. (Silverman Aff. ¶ 17.) Warren Park did, however, have a second offer to buy 10 acres at the $10.80 per square foot price, which is a value of approximately $5,000,000. (*Id.*) Warren Park therefore went back to GE the week of July 14, 2008 with a request to extend the time period by when it would have to have the City's approval and to offer to pay the sales proceeds from the 10 acre land sale to GE in order to pay down the Loan. (*Id.*) When Warren Park approached Matthew Ehret of GE in July of 2008, GE initially said that Warren Park's proposal sounded good but that it would just need the loan committee's stamp of approval. (*Id.*)

38. By July 18, 2008, without explanation, GE notified Warren Park that it would not extend or alter the Loan and that if Warren Park did not (a) pay an additional $2,500,000 by July 25, 2008; (b) agree to move up the maturity date from May 2009 to January 2009; and, (c) agree that no further draws on the Loan would be allowed, GE would begin foreclosure proceedings immediately. (Silverman Aff. ¶ 18.) Warren Park again tried to meet with GE, who, through Matthew Ehret and Julia Silverstein, refused to even meet with Warren Park. (*Id.*)

39. GE would later admit, through Matthew Ehret, Julia Silverstein and others, that GE no longer wanted to be in the real estate lending business and planned to do everything it could to get rid of loans like the one at issue in this case as quickly as possible and get as much money as possible in the process. (Silverman Aff. ¶ 19.)

40. Warren Park could not agree to the terms proposed by GE and the GE Bankers. (Silverman Aff. ¶ 20.) In addition to the $34,800,000 in loan proceeds, Warren Park raised approximately $8,000,000 in equity from investors. (*Id.*) Warren Park has a substantial amount of money invested in this project. (*Id.*) Warren Park, therefore, not only stands to lose the equity it has accumulated in the Property, but also the funds invested thus far in the project and its investor's funds. (*Id.*)

Dated: November 12, 2009        Respectfully submitted,

**DONALD L. SILVERMAN, ERIC W. BRAUSS and TODAY REALTY ADVISORS, INC.**

By: /s/ Steven Blonder
    One of Its Attorneys

Steven P. Blonder
Joanne A. Sarasin
Shawn M. Staples
Much Shelist Denenberg
   Ament & Rubenstein P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606

## **CERTIFICATE OF SERVICE**

I, Steven P. Blonder, an attorney, certify that on November 12, 2009, I electronically filed **DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(A) STATEMENT OF MATERIAL FACTS**, with the Clerk of Court using the CM/ECF system, which will send notification of such filings to the following:

Timothy J. Patenode
Dawn M. Canty
Heather Kuhn O'Toole
Katten Muchin Rosenman LLP
525 West Monroe
Chicago, Illinois 60661
(312) 902-5200

/s/Steven P. Blonder